# MOTION

**COURT:**
UNITED STATES DISTRICT COURT, DISTRICT OF COLUMBIA

**CASE:**
Case No 1:24-cv-03401

**PLAINTIFF:**
George N. Naskaris (Ph.D.)

- Against -

**DEFENDANTS:**
John Doe 1, John Dow 2, John Doe 3, Pavlos K. Sarakis and Sarakis & Associates Law Firm

**PLAINTIFF'S ATTORNEYS:**
Frank R. Schirripa, Partner, Hach, Rose, Schirripa & Cheverie, LLP, NY, NY
John W. Baylet, Associate, Hach, Rose, Schirripa & Cheverie, LLP, NY, NY
Lawrence A. Katz, partner, Lento Law Group, P.C., Washington, DC

**CAUSE FOR MOTION:**
Atty. Schirripa, who is Plaintiff's principal attorney, for reasons he unfairly attributes to Plaintiff, has (a) withdrawn the lawsuit and (b) has sent a resignation letter to the Plaintiff.

**REQUEST:**
Plaintiff respectfully requests that the Court reviews Atty. Schirripa's actions so that the Court decides whether Plaintiff is at fault, as Atty. Schirripa alleges, and if not, the Court may then instruct Atty. Schirripa to continue with the lawsuit or revise it if needed, so that the interests of the Plaintiff will be fully protected.

**NOTE:**
I tried to find in the internet a Motion template I could use, but I couldn't find any. My apology for including the relevant information in this makeshift first page instead of a proper Motion first page. Plaintiff has no legal training, and if he has already misspoken or may yet misspeak on this matter, this is only due to his legal ignorance. Plaintiff is an economist by training (Doctorate in Economics from the Grad. Center of the City University of New York) and among other things, former professor of Economics. Plaintiff now resides in Europe and for safety reasons, he does not want his European address to become part of the public record. In Europe, Plaintiff doesn't have the protection of our laws – justice in Europe is not the justice we know in the US. Plaintiff harbors great respect to Atty. Schirripa and his law firm, but this matter has become very stressful to the Plaintiff, and at 78 years of age, he is on borrowed time

**RECEIVED**
JUL 21 2025
Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

TABLE OF CONTENTS

A. Background of the Case

B. Destruction of Personal Belongings

C. Payment of the Award and Fate of the Whistleblowers

D. Atty. Evan Fried and GHG'S Dissolution Matter

E. Retaining Atty. Frank Schirripa and GHG's Reinstatement Work

F. The Reinstatement Issue

G. Request for Protection by the Court



A. BACKGROUND TO THE CASE

The grounds for Plaintiff's claim in the lawsuit is the award paid by the Securities and Exchange Commission ("SEC") to the whistleblowers who provided the evidence that gave rise to the FCPA case that became known as the Novartis Hellas FCPA case ("the Novartis Case").

The Novartis Case was based on initial information Plaintiff possessed, which he had obtained in 2000-2003, while working on a hospital related venture ("the Deal") in Athens, Greece. Plaintiff had worked with two partners: Georgios Apostolopoulos ("GA"), Chair and largest shareholder of iatriko.gr, the largest publicly traded hospital group in Greece, and Dr. Bernard Broermann ("BB"), Chair and sole shareholder of asklepios.com, the largest privately owned hospital in Germany. At that time, Plaintiff resided in Berlin, Germany. (Plaintiff was born in Greece and came to the US on a student visa on Sunday, August 14, 1966, and became US citizen in May of 1976. Plaintiff spent most of his adult life in NYC and now resides in Europe – the US authorities have his address.) GA and BB completed the Deal but didn't pay Plaintiff for his work. During that period, Plaintiff came across systemic corruption and, among other things, blew the whistle on GA's tax evasion, bribing and money laundering by contacting the authorities, including the Greek version of SEC. But as Plaintiff discovered, the authorities are corrupt, and nothing happened. (Based on Plaintiffs due diligence on the Deal, GA, by paying the taxman a small fee, up until 2003, had evaded payments of as much as $500 million to the tax authorities. Greece defaulted on over $300 billion of sovereign debt in 2011 because of people like GA. But blowing the whistle in Greece is treated as slander and GA sued Plaintiff behind his back and obtained judgments against him as he found out in 2010.) While working on the Deal, Plaintiff had learned that doctors at GA's hospitals and other hospitals were accepting bribes from pharmaceutical companies and especially Novartis. At that time, Plaintiff had found out that bribing elected officials, all the way to the Prime Ministers, was the norm, and had been told by people in the hospital sector that pharmaceutical companies were bribing Prime and Health Ministers in order to obtain lucrative contracts. That is the Novartis Case.

As the pertinent agreements ("the Agreements") provide, Plaintiff is owed 15% of the award paid by the SEC in the Novartis Case. As the Agreements also state, it was the Plaintiff's information that gave rise to the Novartis Case. The other whistleblowers ("WB/s") came on board in order to corroborate Plaintiff's evidence. Plaintiff invited Defendant Pavlos K. Sarakis to the Novartis Case and entered into an agreement with Defendant Sarakis so that Defendant Sarakis would assist Plaintiff in finding additional WBs to corroborate his evidence. Plaintiff introduced Defendant Sarakis to Atty. Andrew Beato of the DC law firm Stein, Mitchell, Cipollone, Beato & Missner (the name has since changed). Over the course of about two years, Plaintiff and Defendant Sarakis found three WBs. With each new WB, a revised agreement was executed by Atty. Beato, Defendant Sarakis, Plaintiff and John Doe 1, John Doe 2 and John Doe 3. In the initial agreement Plaintiff was listed as client and in February of 2016, because of the objection of Defendant Sarakis, Plaintiff was persuaded by Atty. Beato to become consultant. Plaintiff had signed the Agreements as President of Greystone Healthcare Group, Inc. ("GHG"). In October of 2016, Atty. Beato withdrew from the case and Defendant Sarakis vanished. At that point, Plaintiff understood the difference between client and consultant and why Defendant Sarakis insisted that Plaintiff becomes consultant. Defendant Sarakis had deceived Plaintiff. Plaintiff was told that Defendant Sarakis had found another counsel ("New Counsel"), but neither Atty. Beato, nor Defendant Sarakis responded to Plaintiff's request for the name of the New Counsel. In 2021, by accident, Plaintiff found out that the New Counsel was Atty. Stephen Kohn of the DC Kohn, Kohn and Colapinto law firm.

In 2020, in the middle of the Covid Pandemic, Plaintiff had received a subpoena from a Greek court through the DOJ in order to present himself at a court in Athens. Plaintiff's then attorney, Charles Camp of the DC law firm charlescamplaw.com, had responded to the court that given the pandemic and travel restrictions, Plaintiff couldn't travel. In his letter, Atty. Camp had suggested that whoever

was suing Plaintiff, could do so at a NYC court where Plaintiff had a fair chance to defend himself. The court went ahead and tried Plaintiff in absentia. In the one page Judgement Plaintiff received, the court claims that Plaintiff did something while in the Athens area on October 3, 2017, but Plaintiff was not in Athens then, before or after. From what Plaintiff has found out, Defendant Sarakis and John Doe 2 sued Plaintiff for slander. Plaintiff has been advised that they took such action in order to intimidate and silence him. The DOJ, in its investigation into Greek corruption in relationship to the Novartis Case, has been informed on this matter.

For convenience, instead of using Plaintiff, which is me, I am respectfully requesting the Court's permission to use "I, me, and mine" so that I may not accidentally create any confusion.

### B. DESTRUCTION OF PERSONAL BELONGINGS

In 2017, while residing in Hamburg, Germany, I agreed to assist Christos Natsidis, someone I had met as a customer of his restaurant in Hamburg. Mr. Natsidis had told me that he had given about $1.5 million to a family friend who lived in the U.S. with the agreement to be paid the money back in five years, with a 10% annual return. However, the family friend had stolen the money and I had helped Mr. Natsidis in trying to get his money back, including finding an attorney to take action against the family friend. After a great effort, a lawsuit was filed in a court in Florida. Before agreeing to assist Mr. Natsidis, I had asked him where the money came from and he had told me that it was his father's money – his father had been a laborer in Germany. That was a large amount of money and I had asked Mr. Natsidis whether his father had sold any valuable property he had inherited, but he hadn't. As I found out later, the money belonged to Mr. Natsidis and he was hiding in his father's bank account in order to evade payment to the German tax authorities. In 2017, because I was also contemplating to return to the US, I had left with Mr. Natsidis for safekeeping several boxes with personal belongings – clothes, books, boxes with photos, old laptops and a box with copies of agreements and documents, including the hard copies of everything relating to the Novartis Case. When I found out that Mr. Natsidis was a tax evader and money launderer, I confronted him and in revenge, while I was away, he and his German lawyer threw out my personal belongings. I then filed a complaint with the Police in Hamburg but nothing was ever returned to me. I then informed the court in Florida that was handling his case about Mr. Natsidis's tax evasion and his having thrown out my belonging (please see attachment labeled DOC-4 for details). The destruction of my personal belongings becomes an issue as I will explain below.

### C. PAYMENT OF THE AWARD AND FATE OF THE WHISTLEBLOWERS

For reasons I can explain to the court if needed, I had remained an insider in the Novartis Case so that, among other things, along with Defendant Sarakis and Atty. Kohn, I could receive SEC's notifications. On August 3, 2023, I received an electronic letter from the SEC informing me that the SEC had decided on an award of $104 million, of which, in my estimate, which was proven correct later on, 80%, or about $80 million, was for the Novartis Case and the remaining 20% was for a case involving violations perpetrated by Novartis in the Far East.

As early as thirty days after the announcement, the SEC transferred the $104 million to Atty. Stephen Kohn who, after keeping 35% for his law firm, wired 80% of the remaining about $70 million, or $56 million, to Defendant Sarakis to be paid to the WBs. However, my research indicates that the WBs may have received no money whatsoever and two of them have been sued for slander by the ten politicians ("the Ten"), including Prime Ministers and Health Ministers, who had accepted the bribes, on which the Novartis Case was built. My research also indicates that Defendant Sarakis has disclosed the names of John Doe 1, John Doe 2, John Doe 3 and a fourth WB



whom I didn't know then but I know now because the Ten, using as their weapon the public prosecutors, who are as corrupt as the system, are suing the WBs for slander. The WBs are accused for providing to the SEC and DOJ false information. As a result, the WBs are accused for slandering law abiding Greek elected officials. As I have already mentioned, blowing the whistle in Greece is illegal and this is how corrupt politicians and business elite protect themselves, using public prosecutors as a weapon. If the Court so wishes, it could invite as witness, Atty. Ippokratis Mylonas, who is defending John Doe 1, who has been sued by the Ten for slander (please see attachment labeled DOC-5 for details)

### D. ATTY. EVAN FRIED AND GHG'S DISSOLUTION MATTER

In September of 2023, I sent a Demand for Payment to Atty. Kohn, which he ignored. I also requested a meeting with him and flew to DC to meet him, but he was not available I was informed by email the day I was supposed to meet him. I then looked for an attorney, but I am in Europe, and because of the Thanksgiving and Christmas holidays it took me some time to find an attorney to handle this matter on contingency – I couldn't pay by the hour. In February of 2024, Evan Fried, a NYC attorney I had contacted, had told me that my adversaries would make an issue of GHG's dissolution. Atty. Fried had asked me about the clause in the Agreements which allows GHG to transfer its rights to me, and I had told him that as I remember, I had made the first transfer ("Transfer/s") in February 2016, and because another WB was found that April, I most likely had made a second transfer in May of that year when the last agreement was signed. However, I told him that the Transfers, along with several other documents were in the boxes Mr. Natsidis had thrown out. Atty. Fried had then advised me to reinstate GHG.

### E. RETAINING ATTY. SCHIRRIPA AND GHG'S REINSTATEMENT WORK

Before retaining Atty. Schirripa, I had made him aware of the GHG matter and in April of 2024, I entered into an agreement with Atty. Schirripa which provided that his law firm pays for all expenses involved in the lawsuit. Pursuant to execution of the agreement, I had asked Atty. Schirripa to pay for GHG's reinstatement, but he declined, and because I wanted to keep our relationship friendly, I didn't argue with him. At that time, I had mentioned the Transfers to Atty. Schirripa and he had insisted on reinstating GHG. I then asked CPA Paul Fradelakis, whose office is in Astoria, NYC, to handle the reinstatement of GHG, and had introduced him to Atty. Schirripa via email. I had also asked Atty. Schirripa to speak with Mr. Fradelakis so that he was familiar with the GHG matter. Because Mr. Fradelakis wanted a significant amount of money for the reinstatement of GHG, we agreed that I would pay him far more than that when I receive my share of the award, and we had signed an agreement to that effect. I had emailed a copy of that agreement to Atty. Schirripa in case by the time I received my share of the award, I would no longer be with the living – at 78, I am on borrowed time. In January of this year, Mr Fradelakis told me that NYS had accepted the reinstatement of GHG and I then made the necessary payments to NYS. In March, Mr. Fradelakis filed for GHG's 2024 taxes, and I made all the necessary payments. Furthermore, I signed Greystone Healthcare Group, Inc.'s, tax filings for 2024 as its President. All that information was conveyed to Atty Schirripa.

### F. THE REINSTATEMENT ISSUE

Earlier this year, Atty. Schirripa, through Atty. Katz, filed the Complaint and subsequently, he received a document from the attorney of Defendant Sarakis requesting certain answers. From what I understand, the attorney of Defendant Sarakis had checked the pertinent website of NYS, where,

although NYS had accepted the reinstatement of GHG, it has not yet posted it on its pertinent website, and from what Atty. Schirripa has told me, they raised an issue about that. He then told me that he can be sanctioned if he continues – this is what he told me. We had made no false statement in the Complaint and I couldn't understand the sanctions issue Atty. Schirripa had raised. Subsequently, Atty. Schirripa blamed me for what happened, but I had and still don't have a clear understanding of what happened. Atty. Schirripa then sent me his resignation and a copy of a letter he had sent to the court asking the court to withdraw the lawsuit (please see attachments labeled DOC-2 and DOC-3). Given the critical role GHG plays in the lawsuit, Atty. Schirripa or rather his colleague, Atty. John Baylet, who does the research, should have checked NYS's pertinent website or asked Mr. Fradelakis whether the process was completed or even asked me so that I could ask Mr. Fradelakis. But neither Mr. Fradelakis nor I were asked.

### G. REQUEST FOR PROTECTION BY THE COURT

Atty. Schirripa has withdrawn the lawsuit without prejudice as I have read in the document he sent me, however, his resignation as my attorney prejudices me because others will consider me unreliable. As a result, my claim will be lost not for something I did, but for something Atty. John Baylet failed to check – he does the research from what I have observed.

In light of what has happened, I, as Plaintiff, respectfully request the full protection of the court. If our laws grant me the right to request that the Court reviews the reasons Atty. Schirripa has provided for his resignation as my attorney, I hereby respectfully make such request, so that the Court may decide whether Atty. Schirripa has a valid reason to withdraw as my attorney. And if the Court decides that Atty. Schirripa doesn't have a valid reason to resign, I hereby respectfully request that the Court, in its power, instructs Atty. Schirripa to continue his work on the lawsuit or a revised lawsuit if needed, including contacting the pertinent authorities in NYS so that GHG is posted on NYS's pertinent website – State authorities pay far more attention to lawyers than to CPAs. Also, the Plaintiff in the lawsuit is George N. Naskaris, but I signed the Agreements as President of GHG; in absence of the Transfers, is it I or GHG who is the right Plaintiff?

I should mention that Atty. Schirripa, who is a successful attorney and tough litigator, handles several cases simultaneously, some of which he gives out to attorneys in other states, as is my lawsuit, and anyone case may mean very little to him, but, at 78, this case means everything to me and my inheritors, my three little granddaughters who live in the State of Massachusetts. Atty. Schirripa has a copy of my Last Will and Testament in case I have to face the ultimate Judge before this case is over.

Most respectfully,
Dr. George N. Naskaris (Ph.D., Econ)
Monday, July 21, 2025

I am in Europe now, and for reasons already mentioned, I will not use my address in Europe and, since NYS has accepted GHG's reinstatement as I have been informed, I will use GHG's NYC address instead as follows:
Dr. George Naskaris, President
Greystone Healthcare Group, Inc.
244 Fifth Avenue, 2nd Floor
New York, NY 10001, USA.

# HACH ROSE SCHIRRIPA & CHEVERIE LLP
ATTORNEYS AT LAW

June 23, 2025

**VIA EMAIL**

George N. Naskaris
Greystone Ventures Group, Inc.
244 Fifth Avenue, 2nd Floor
New York, New York 10001
Tel.:  +49 174 488 7221
greystonesnyc@gmail.com
george1@thegreystones.com

     *Re:*    *Termination of Representation*

Dear Dr. Naskaris:

     Pursuant to the terms of the RETAINER AGREEMENT, executed on April 26, 2024, Hach Rose Schirripa & Cheverie LLP ("HRSC") hereby terminates its legal representation of you for the purposes of investigating your claim for damages in connection with the Novartis Hellas FCPA Whistleblower matter. This termination letter, effective immediately, hereby revokes any and all rights granted to HRSC to take legal steps to pursue the aforementioned claim.

     Should you intend to pursue this matter further, we urge you to seek the services of another attorney before your claims may be considered time barred. We will be happy to share any information we have acquired with an attorney of your choosing.

                               Sincerely,

                               */s/ Frank R. Schirripa*
                               Frank R. Schirripa

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| GEORGE N. NASKARIS,<br><br>        Plaintiff,<br><br>-against-<br><br>JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, PAVLOS K. SARAKIS, and SARAKIS & ASSOCIATES LAW FIRM,<br><br>        Defendants. | Case No 1:24-cv-03401 |

**NOTICE OF VOLUNTARY DISMISSAL PURSUANT TO F.R.C.P. 41(a)(1)(A)(i)**

Pursuant to F.R.C.P. 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure, Plaintiff hereby gives notice that the above-captioned action is voluntarily dismissed, without prejudice against all Defendants. No answer has been served and no motion for summary judgment has been filed.

Dated: June 23, 2025

**OF COUNSEL**

**HACH ROSE SCHIRRIPA
& CHEVERIE, LLP**
Frank R. Schirripa
John W. Baylet
112 Madison Avenue, 10th Floor
New York, New York 10016
Tel: 212-213-8311
fschirripa@hrsclaw.com
jbaylet@hrsclaw.com

*Attorneys for Plaintiff*

Respectfully submitted,

*/s/ Lawrence A. Katz*
Lawrence A. Katz
**LENTO LAW GROUP, P.C.**
1814 RT 70 STE 321
Cherry Hill, NJ 08003
P: (856) 652-2000 EXT 497
F: (856) 375-1010
lakatz@lentolawgroup.com


*Attorneys for Plaintiff*

1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

PASCHALIS NATSIDIS, VASSILIKI
NATSIDOU, CHRISTOS NATSIDIS,
LABRINI NATSIDU,

                Plaintiffs,              Case No: 2:17-cv-368-FtM-38MRM

KONSTANTINOS KONSTANTINOU,
SHANNON KONSTANTINOU, and
GEORGIOS KONSTANTINOU

                Defendants
_____/

**MOTION TO CEASE AFORESAID CASE**

1. **INTRODUCTION**

I would like to respectfully make the court aware of certain issues regarding the aforesaid case ("Case"), which issues I consider most critical if the spirit of the law is to be preserved; I have no legal training, other than the peripheral knowledge one acquires by having dealt with legal issues in business and matrimonial matters.

That said, I would like to respectfully state for the record that I am a Greek born naturalized U.S. citizen, former Asst. Prof. of Economics at the Business School of Seton Hall University, S. Orange, NJ, from where I resigned several years ago in order to pursue business interests. I would also like to state for the record that a few years ago, I founded a non-profit entity, Accountability International, Inc., whose mission is to, among other things, promote fair business practices and tax compliance globally, and especially in Europe, where I have resided for over fifteen years. I would further like to state for the record that in 2010-11, the Greek state defaulted on over Three Hundred (300) Billion Dollars in sovereign debt because the wealthiest Greek families have evaded their tax obligations and elected officials have stolen public funds, and as a result, German, U.S. and other taxpayers had to bail-out Greece at an immense cost to them; they have provided Greece with about Four Hundred (400) Billion Dollars in bail out loans at great risk. (*U.S. taxpayers are the largest contributors to the International Monetary fund, which has contributed about $40 billion in loans to Greece.*) Last, I would like to state for the record that I cannot go to Greece because I have blown the whistle on elected officials and business elite who collectively owe close to $1 billion in back taxes and the tax collectors have turned a blind eye; they have been bribed. Blowing the whistle on corruption is severely punishable in Greece; predators are protected by the law.

2. **CRITICAL ISSUES**

Regarding the critical issues, they involve (i) violations of tax compliance by Christos Natsidis ("Natsidis"), who, my research indicates is using his parents, Paschalis Natsidis and Vassiliki Natsidou, as fronts for money he is hiding from the German and Greek tax authorities and (ii) that Natsidis mislead me and fraudulently used me in order to achieve his objectives and then used his attorney, Gunnar Kross ("Atty. Kross") to intimidate and silence me, and I will provide the court with some facts so that the Court, among other things, may consider whether the Case can continue in its present form. Natsidis has also either maliciously destroyed or is holding hostage personal belongings I had left with him for safe keeping (*please see section "4" below for details*) and is not paying me for my work.

3.  **BACKGROUND**

Starting in October 2016, Natsidis, whom I had known from visiting his restaurant when in Hamburg, Germany – I resided in Hamburg during the pertinent time period – asked me whether I could help him open a bank account in Zurich, Switzerland, because he was expecting a large amount of money from someone in the U.S. (*From what he had told me, this money had to do with money his father had sent from Greek banks to German banks and then to someone's bank account in the U.S.*) I had told him that as long as the transaction was legal, I could introduce him to people in Zurich who could handle his banking needs; because of my work, I have financial contact in the U.S., the E.U., the Middle East and the Far East. Then last January, when I went back to Hamburg, after having spent two months with members of my family in the U.S., in response to a message I had received from Natsidis, I visited him and he told me that he and his family (collectively "he, him, his") had given to a money manager in the U.S., Konstantinos Konstantinou ("KK"), EUR 1,050,000 (One Million Fifty Thousand Euros) and were expecting that money, plus 10% fixed annual return over a five year investment period, for a total of about EUR 1,500,000, or about $2 million. He had also told me that he had problems getting the money back. I had told Natsidis that there is no such thing as 10% fixed return and he had responded that he had a letter to that effect.

Subsequently, Natsidis, who does not speak English, had never been to the U.S. an had no wish to go to the U.S., asked me for assistance in finding an attorney in New York to help him get his money back. And to make a long story short, between mid January and mid September of 2017, I invested over 1,500 hours trying to help Natsidis – his case became my case because he was incapable of doing anything other than calling or sending me messages several times a day regarding the flow of emails he was receiving from the attorneys he retained; I was copied on all emails in my capacity as translator and intermediary. This involved multiple trips to New York and the places that KK has listed as residences on Natsidis' behalf. Initially, it involved research in finding, contacting attorneys in NYC and arranging meetings with them so that he could find someone he liked and could afford.

Over the course of ten days last February, after meetings with several attorneys in NYC, and after multiple meetings with those he liked, Natsidis settled on the Seiden Group, whose Managing Partner is Robert Seiden. Since mid January, and through September, when not traveling, I met Natsidis daily, and even on Saturdays, in order to translate documents and emails and to help him draft responses to the Seiden Group – he would write them in Greek and I would translate them; all legal documents were translated by a professional service. Before signing the retainer agreement with Seiden, I asked Natsidis to

email the document to a translation service in Greece which was charging about 1/3 of what translators charged in the US, but he did not want to spend the money, and I then brought him to another party, who spoke fluent Greek, and who translated the retainer agreement to him, before signing it. And when I was away, I communicated constantly with Natsidis via email, phone and whatsapp messages because I believed that hard working people had been taken advantage by KK. At the request of Atty. Seiden, I also signed a document as translator that he had prepared.

I should point out that before deciding to work with Natsidis, I had asked him explicitly about the nature of the EUR 1,050,000 and he had told me that his sister and her husband or partner had contributed EUR 300,000 and his father had contributed EUR 850,000 and because I had found the last amount enormous given that his parents had menial jobs in Germany, I had asked him whether his father had inherited property from his parents in Greece that he had sold, and he had assured me that it was money his parents had earned washing toilets and floors in Germany (**I quote him**), and I went along with that, but the doubt lingered in my mind. In May, I asked him again about the source of the 850,000 Euros and he had even cried while telling me that the money was his parents. Sometime in September, I happened to talk to someone who knows Germany better than I do and asked him about the salaries for menial workers and the tax structure and he had told me that even if Natsidis' parents had double jobs, they may had at best saved 300,000 Marks, or about 150,000 Euros. I was also told that if someone saved 850,000 Euros, or 1,700,000 Marks, his gross income would have been over 3,500,000 Marks – the tax rate was over 50% - and this is an astronomical amount of money. (*In 2000, Germany and several other European Union member states accepted the Euro as their common currency; one Euro was Two Marks.*) Pursuant to better understanding the nature on the 850,000 Euros, I informed Natsidis about it and he ceased communicating with me and when I asked to meet him to, among other things, discuss my compensation and return of personal belongings ("Belongings"), including two laptops and a box with over 250 pages of confidential documents, I had left at his house for safe keeping, he ignored my requests, and he instead sent me a letter from Atty. Kross (Exhibit A).

Regarding the letter from Atty. Kross, it was translated by Holger Scherf, Legal Counsel of the German Embassy in Washington (Exhibit B) and was emailed to me on November 1. As I found out then, Atty. Kross was demanding that unless I took the Belonging by October 20, they would be thrown out. On October 13, I had sent an email to Atty. Kross, using the e-address of his partner, Marc Lehmann, from Riga, Latvia, where I was, with copies to Natsidis and others, informing him that I was in receipt of an email from Natsidis – it only had an attachment – which I did not understand (Exhibit C). Given that the issue was most critical, Natsidis, who knows that I do not speak German, could have provided a warning in Greek, but did not. He was also aware of the importance of the documents and the laptops and he knew of my work with Accountability International.

Natsidis has also refused to pay me for my work and Atty. Seiden suggested that I accept $10,000 (Ten Thousand Dollars) for the over 1,500 hours I invested in the Case as translator and intermediary, and I told him that the court may set an hourly rate and total amount.

4. **PERSONAL PROPERTY HELD HOSTAGE OR MALICIOUSLY DESTROYED**

Since November 1, I have contacted Natsidis and Atty. Kross several times regarding the status of the Belongings, and especially the laptops and documents, to no avail. On November 24, I sent a letter via email and post to Atty. Kross requesting information on how the Belongings were disposed if they were disposed (Exhibit D). One of the laptops contains files with information that relate cases that are currently being investigated by the U.S. Department of Justice and the Securities and Exchange Commission, and if the law grants me such right, I hereby respectfully request that the Court intervenes so that I can get the Belongings, and especially the laptops and documents, back.

### 5. PURPOSE OF MOTION

As I have already respectfully indicated, my research shows that taxes have not been paid on the 850,000 Euros. The 850,000 Euros belong to Natsidis and he kept this money in his parents' bank accounts in order to evade payment of taxes. (*This money had been transferred from Germany to Greece most likely in suitcases and deposited in Greek banks I believe by bribing bank managers, thus violating German and Greek tax laws. Once deposited in a bank, the money was laundered and could be wired anywhere, including the US.*) There are no four claimants to the Case, there are only two: Natsidis and Lambrini Natsidu; the parents are only fronts.

Given that Natsidis has misled the court, if our laws grant me such right, I hereby respectfully request that the court considers (i) ceasing the Case, so that Natsidis and his sister will file another case as the true claimants and (ii) Natsidis pays the Court for all court expenses related to the Case. I should respectfully inform the court that if Natsidis had filed a similar claim in German court, that court would have required that he paid up front about $150,000 for a claim of $1,500,000 – claimants pay for court expenses in Germany and if they win, the defendants compensate them – and since the claim has become a "triple damages" claim, as is allowed by the laws of Florida, to the great benefit of Natsidis, the German court would have required an up-front payment of about $450,000. It is only fair that the Court considers asking Natsidis to pay the Court for the time of all court personnel involved in the Case, amortization of the building and all other operational and administrative expenses, an amount of $450,000 for otherwise U.S. taxpayers are paying for someone who is not only evading his obligation to his tax authorities, but is also taking advantage of U.S. taxpayers. The Court may ask Mr. Scherf of the German Embassy in Washington for the exact amount a court would require as up-front payment for a similar case in Germany.

Respectfully,
George Napoleon Naskaris, Ph.D.
U.S. Address: c/o Greystone Ventures Group, Inc., 244 Fifth Ave, 2nd Fl, New York, NY 10001

Residence: Usedom, Germany

Wednesday, December 6, 2017


**NOTE: there are four Exhibits – A, B, C and D – sent in same envelop with the Motion**

https://www.kathimerini.gr/society/dikastiko/563548900/novartis-xekinise-i-diki-ton-proin-prostateyomenon-martyron/

KATHIMERINI.GR … Judicial

# Novartis: The trial of the former protected witnesses has begun

The court decided to reject the objections in support of the accusation, while the judges' judgment on the objection to the statute of limitations for the offences is awaited

Sofia Spingou
04.04.2025 • 16:06

The **trial** of **Novartis**' former protected witnesses began with objections, against whom criminal prosecution was brought for false testimony and false accusation by political figures who had been targeted by their testimony.

The court decided to reject the objections in support of the accusation, while the judges' judgment on the objection to the statute of limitations for the offences is awaited.

At the beginning of the proceedings, **Filistor Destabasidis**, the former protected witness in the Novartis case with the code name "Maximos Sarafis", proceeded to completely deny the accusations attributed to him.

**"Obviously, I deny the accusations and declare once again that these testimonies of mine are true.** In any case, from now on, I note that, as my lawyer will explain, the disputed criminal acts (which I did NOT commit) have already been statute-barred, due to the drafting of the writ of summons after five years from their alleged committal," said the defendant and added that "we all know that the Novartis illegalities under consideration were first denounced by protected witnesses in the United States and that Novartis' criminal settlement was based on those allegations. which chose to pay $311 million to America, in order to avoid criminal prosecution for its illegal actions in Greece."

The defendant also referred to the special court, in which prosecutor Eleni Touloupaki was acquitted, noting that "in the context of an investigation of a relevant felony charge against the mentioned prosecutors, the Court in 2022 unanimously acquitted the prosecutors and ruled that I am a reliable witness of public interest". The accused, among other things, requested the television broadcast of the trial.

The former protected witness **"Aikaterini Kelesi"** is also accused in the case, while the former protected witness **Nikos Maniadakis** has a double capacity as he is accused in one case and a plaintiff in another.

The defendants are on trial for the offenses of false testimony and false accusation following lawsuits filed by, among others, Adonis Georgiadis, Dimitris Avramopoulos, Yiannis Stournaras, Andreas Loverdrou, Marios Salmas, Antonis Samaras, Evangelos Venizelos.

| NOVARTIS | COURTS |

Sofia Spingou
Latest articles:

- The "Blood Donor History" changes
- "Spartans": The trial for the case of voter fraud was postponed for the third time
- Table tennis between the government and bar associations